UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

UNITED STATES OF AMERICA,

        NO. CR. S-05-0365 FCD

      Plaintiff,

   v.              MEMORANDUM AND ORDER

JAMES D. BURKE,

      Defendant.

----oo0oo----

This matter is before the court on defendant James D.
Burke's ("Burke" or "defendant") motion to suppress over 28 boxes
of evidence taken during the search of a Las Vegas residence and
nearby storage facility on February 19, 2003.  Defendant also
moves to dismiss the indictment on the basis that the government
allegedly lost or destroyed exculpatory evidence taken during the
search.  A three-day evidentiary hearing was held in August 2008.
Thereafter, the court requested supplemental briefing.  Having
reviewed the file herein and heard the testimony of witnesses and
arguments of counsel, the court DENIES defendant's motion to
suppress and defendant's motion to dismiss.

1

# BACKGROUND[1]

Defendant is charged in the indictment with 33 felony counts, including bankruptcy fraud and money laundering. (Indictment [Docket #6], filed Sept. 8, 2005.) Defendant has pled not guilty to all of these charges.

On February 14, 2002, Truck-A-Way ("TAW"), a corporation controlled by defendant James Burke, commenced a voluntary Chapter 11 bankruptcy proceeding in the Eastern District of California. On March 6, 2002, the Bankruptcy Court issued an order to show cause why the petition should not be dismissed for failure to file the required documents. Subsequently, on May 1, 2002, the TAW bankruptcy proceeding was converted to a Chapter 7 bankruptcy proceeding. On June 13, 2002, a creditor filed a petition for involuntary bankruptcy against James Burke individually. The court granted the petition on January 7, 2003.

In June 2003, James and his wife, Linda Burke, moved out of their home in Vacaville, California at 230 Buck Avenue. (Tr. 3:10; Govt. Ex. 4.) Linda Burke and her two children moved to a residence in Las Vegas, Nevada at 1008 Venetian Hills (the "Las

---

[1]    The facts are taken from the evidence received at the evidentiary hearing held in August 2008. (See Rep.'s Tr. of Evidentiary Hr'g on Def.'s Mot. to Suppress and Mot. to Dismiss ("Tr.")). The court notes the volume of the transcript and the page ("Volume:page"). Volume 1 refers to the testimony given the morning of August 22, 2008, Volume 2 refers to the testimony given the afternoon of August 22, 2008, Volume 3 refers to the testimony given the morning of August 26, 2008, Volume 4 refers to the testimony given the afternoon of August 26, 2008, Volume 5 refers to the testimony given the morning of August 27, 2008, and Volume 6 refers to the testimony given the afternoon of August 27, 2008.

The court takes judicial notice of the facts relating to filings in the related bankruptcy proceedings.

Vegas residence" or the "residence").  (Tr. 3:10; Govt. Ex. 1.)

Linda Burke testified that at the time of the move to Las Vegas,

she informed defendant that he was not welcome at the residence

until he cleared up the legal problems relating to the TAW and

his individual bankruptcies.  (Tr. 3:10.)

Throughout the bankruptcy proceedings, there were numerous

motions filed and orders issued regarding the turnover of

documents relating to both bankruptcy proceedings.  In November

2002, upon motion of the bankruptcy trustee, multiple orders were

entered against the debtor requiring the accounting and turnover

of all books and records, as well as permitting the sale of

personal property of the bankruptcy estate.  These orders were

followed by an order from the court filed on January 17, 2003,

directing the defendant to file schedules, a statement of

financial affairs, and other documents relevant to the

bankruptcy.[2]

Subsequently, on February 19, 2003,  J. Russell Cunningham[3]

("Cunningham"), counsel for the trustee in the TAW bankruptcy

proceeding, filed an "Ex Parte Application for Order Authorizing

the Immediate Entry, Search and Seizure of Property" ("the _ex_

---

[2]    On March 3, 2003, subsequent to the search at issue in
the motion to suppress, the bankruptcy court held defendant in
contempt for failing to turn over TAW financial documents and
records as required by a prior order.

[3]    On August 12, 2003, this court disqualified Cunningham
and his law firm from representing the then-trustee in the TAW
bankruptcy proceeding, Hank Spacone ("Spacone"), in light of
their involvement in the February 2003 search at issue in this
motion.  Shortly thereafter, the trustees for the TAW and James
Burke estates resigned and were replaced.

parte application") in the bankruptcy court.[4]  The proposed order

submitted by Cunningham purportedly authorized the search and

seizure of property allegedly belonging to the bankruptcy estate

at the Las Vegas residence, a residence in Palm Desert,

California, and unspecified storage lockers.  In re. Truck-A-Way,

300 B.R. 31, 33 (E.D. Cal. 2003).  According to Cunningham, the

ex parte application was necessary because his past experience

indicated that James Burke was likely to defy any court order by

concealing assets and records belonging to the bankruptcy estate.

See id.  The bankruptcy court granted the ex parte application

without notice and signed Cunningham's proposed "Order

Authorizing the Immediate Entry, Search and Seizure of Property"

("the order") without alteration.  Id.  The order allowed the

trustees for the James Burke and TAW bankruptcy estates, along

with "their designated professionals," to "[i]mmediately enter"

James Burke's residences in Las Vegas and Palm Desert and "[a]ny

storage unit reflected in documents" at those locations, "picking

or re-keying the door locks if necessary."  It also authorized

searches of the premises, removal of items that were property of

the Burke or TAW bankruptcy estates, and searches of "the persons

and personal effects . . . of any person at the premises or who

arrives at the premises while the search of the premises is being

conducted."  Id.

On the same day that the bankruptcy court issued the order,

Cunningham flew to Las Vegas to lead the search of the Las Vegas

residence.  In re. Truck-A-Way, 300 B.R. at 33.  Cunningham

---

[4]     The order was sought jointly by Spacone and Thomas
Aceituno, the trustee in the personal bankruptcy of James Burke.

arrived at the Las Vegas residence to conduct the search
personally, along with the trustee for the Burke estate, Thomas
Aceituno ("Aceituno"), and two armed deputy U.S. Marshals.  Id.
Pat Lyon ("Lyon"), counsel for Aceituno as trustee of the Burke
estate, arrived later.  (Tr. 4:152.)  Cunningham, Aceituno, and
Lyon seized a computer and paper records from the second floor
loft/office area and boxes from the garage and office area.  (Tr.
4:152-54.)  They also seized keys for a rented storage facility
that were located in the kitchen.  (Tr. 4:153.)  The computer and
other materials seized were placed in their vehicles.  (Tr.
4:154.)

     After searching the residence, Cunningham, Aceituno, and
Lyon immediately drove to the storage facility located about a
mile from the house.  (Tr. 4:157.)  They discovered boxes that
contained business records relating to TAW.  (Id.)  They seized
the boxes and stored them in their vehicles overnight.  (Id.; Tr.
4:162.)

     On February 20, 2003, Aceituno had a copy made of the hard
drive from the computer seized at the residence.  (Tr. 4:166.)
Cunningham, Aceituno, and Lyon then shipped the boxes seized via
Federal Express from Las Vegas to Cunningham's office in
Sacramento, California.  (Tr. 4:172-73.)  As a result, Cunningham
continued to retain the documents and stored them in his office.[5]
(Tr. 4:174; 5:14.)  Cunningham subsequently turned over the
seized boxes and documents to the United States Trustee on or

---

     [5]   At one point, Cunningham took the boxes out of his
office to a conference room to do one last review and inventory
with Aceituno and Lyon.  (Tr. 5:26.)

about September 30, 2003.  (Tr. 5:27, 31.)  Jason Lamb, an agent
for the Internal Revenue Service, Criminal Division, took
possession of the boxes.  (Tr. 6:94-95.)  The boxes were stored
in the evidence warehouse at the Internal Revenue Service Office.
(Tr. 6:95.)

On July 2, 2007, defendant filed a motion to dismiss the
indictment on the basis that the government destroyed exculpatory
evidence and joined a motion filed by codefendant Linda Burke to
suppress all evidence taken during the February 19, 2003 search.
On March 10, 2008, during a status hearing on the pending motions
in the case, the court asked counsel for the defendant to address
the issue of standing through the filing of a supplemental
declaration.  On April 14, 2008, Linda Burke pled guilty to a
violation of 31 U.S.C. § 5324(a)(3), Structuring Financial
Transactions.  One week later, the defendant filed a supplemental
declaration addressing his interest in the properties searched on
February 19, 2003.

Between Friday, August 22, 2008, and Wednesday, August 27,
2008, the Court heard three days of testimony on the motions
filed in this case.  At the conclusion of the hearing, the Court
asked the parties to submit further briefing on the issue of
standing and on defendant's motion to dismiss in light of the
testimony given.

**ANALYSIS**

**A.   Motion to Suppress**

Defendant moves to suppress the evidence seized during the
search executed on February 19, 2003.  The government asserts
that defendant James Burke cannot object to the search because he

lacks a legitimate expectation of privacy in the Las Vegas residence and storage locker that were searched and in the particular items seized during that search.

It is well establish that remedies for violations of constitutional rights are only "afforded to a person 'who belongs to the class for whose sake the constitutional protection is given.'" United States v. Salvucci, 448 U.S. 83, 86 (1980) (quoting Hatch v. Reardon, 204 U.S. 152, 160 (1907)). Specifically, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128, 133 (1979) (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)); see Katz v. United States, 389 U.S. 347, 351 (1967) ("[T]he Fourth Amendment protects people, not places."). Therefore, the exclusionary rule, which allows the suppression of evidence obtained where a party's constitutional rights have been violated, may only be asserted by a person whose rights have been violated; "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas, 439 U.S. at 134. Rather, a disputed search and seizure must have infringed upon an interest of the defendant "which the Fourth Amendment was designed to protect." Id. at 140. The Court has made clear that, in this context, the Fourth Amendment protects against government intrusion in those places where a person has a legitimate expectation of privacy. Id. at 143.

/////

To demonstrate a legitimate expectation of privacy that gives rise to Fourth Amendment protections, the defendant must establish that (1) he manifested a subjective expectation of privacy in the object of the challenged search; and (2) society is prepared to recognize that expectation as legitimate.[6] California v. Ciraolo, 476 U.S. 207, 211 (1986); United States v. Shryock, 342 F.3d 948, 978 (9th Cir. 2003); United States v. Nerber, 222 F.3d 597, 599 (9th Cir. 2000).  "The defendant has the burden of establishing, under the totality of the circumstances, the search or seizure violated his legitimate expectation of privacy in a particular place."  United States v. Davis, 932 F.2d 752, 756 (1991) (citing Rawlings v. Kentucky, 448 U.S. 98, 104-05 (1980)).

**1.**   **Search of the Residence**

**a.**   **Subjective Expectation of Privacy**

After a review of the credible evidence presented by the parties, the court finds that defendant has not borne his burden of demonstrating that he had an actual, subjective expectation of privacy in the Las Vegas residence searched, and more

/////

---

[6]   At various times during the briefing and argument relating to this motion, both the court and parties have addressed this as a question of "standing."  Both the Supreme Court and the Ninth Circuit have "cautioned against invoking this concept," clarifying that the definition of Fourth Amendment rights "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."  United States v. Davis, 332 F.3d 1163, 1167 n.2 (9th Cir. 2003) (quoting United States v. Nerber, 222 F.3d 597, 599 n.1 (9th Cir. 2001); Minnesota v. Carter, 525 U.S. 83, 88 (1988)).  However, despite referring to the issue as one of standing, the court notes that the parties have substantively addressed the appropriate inquiry under the Fourth Amendment.

particularly, in the boxes and computer seized from the residence and sought to be suppressed by this motion.

The determination of whether a defendant has a subjective expectation of privacy in a particular place may be based upon statements made by the defendant, Rakas, 448 U.S. at 105, as well as his actions, United States v. Haydel, 649 F.2d 1152, 1155 (5th Cir. 1981). Where a defendant unequivocally disclaims ownership of the place searched, he gives up any expectation of privacy. United States v. Decoud, 456 F.3d 996, 1007 (9th Cir. 2006) (citing Abel v. United States, 362 U.S. 217, 241 (1960) (holding that one who has voluntarily abandoned property cannot subsequently complain about its search and seizure); United States v. Nordling, 804 F.2d 1466, 1469-70 (9th Cir. 1986) (stating that a defendant relinquishes any expectation of privacy after disclaiming interest in the property); United States v. Cella, 568 F.2d 1266, 1283 (9th Cir. 1977) (explaining that denying ownership of property when questioned constitutes abandonment of that property)).

In this case, the credible evidence demonstrates that until the filing of this motion, defendant James Burke consistently denied interest in the residence searched and in the property within the residence. Defendant admitted that at the time of search he told Aceituno that he didn't live at the house. (Tr. 1:41:19-21). A letter handwritten by defendant, dated February 19, 2003, provides:

> Linda called – trustee named Aceituno there & Police, demanding to search the house – I asked for what – she said records or something.  I told her that everything there is yours & kids personal property and your business interest records – he shouldn't even be there.

9

I asked her to put Aceituno on the phone.  Aceituno answered. – I asked him what he was doing there – he said "I'm here to search your home for anything that belongs to your or Truck-A-Way's estate."  I told him I don't live there – he said "Yeah, that's what your wife said."  I told him that any records in the house is a property of Linda & kids & their business interest records. . . . Linda confirmed she told him I no longer lived there & everything in the house was hers/kids. . . . Linda is very upset – doesn't want anyone in her house searching for ???

(Govt. Ex. 20; Tr. 1:43-45.)  Thus, in addition to statements made verbally to Aceituno, defendant explicitly stated in the foregoing memorialization he drafted subsequent to the search that he did not live at the residence, that the residence was Linda's home, and that everything in the house was Linda's and children's personal property.

Moreover, prior to the search, defendant disavowed ownership in the boxes stored in the garage and the house.  Linda Burke testified that James Burke specifically told her that the boxes at issue "are yours and the kids.  These are for your interest solely."  (Tr. 3:24.)

Defendant's disavowal of residency and ownership interest in the property was also confirmed in court filings made subsequent to the search.  Approximately ten months after the search, Linda Burke retained an attorney for herself and her two children regarding the search.  (Tr. 3:36.)  Defendant was present at the initial meeting with Linda Burke and the attorney, and he provided the attorney with the handwritten document he had drafted subsequent to the search.  (Tr. 3:37.)  Defendant is listed as a plaintiff on the complaint filed in the United States

District Court for the District of Nevada[7] and in the subsequent filings made in opposition to motions filed by the defendants in the lawsuit. (Exs. 2-4 to Govt.'s Supp. Briefing Re. Standing ("Supp. Standing") [Docket # 125], filed Apr. 30, 2008.)[8]  These filings represent that James Burke was residing in California, not Nevada, and that he did not own the residence where Linda Burke and the children were living. (Ex. 2 to Supp. Standing at 3; Ex. 3 to Supp. Standing at 3; Ex 4. to Supp. Standing at 2.) The filings also represent that James Burke "was not a resident of Nevada, nor did he own any real property in Nevada, and in particular did not own or have an ownership interest in the property located at 1008 Venetian Hills Lane in Las Vegas, Nevada." (Ex. 3 to Supp. Standing at 3.)  Moreover, the filings made on behalf of defendant specifically provided that the residence was not "in any way owned, controlled or occupied by JIM BURKE." (Id.)

     With respect to the computer seized during the search, the computer was located in the second floor office-area loft. (Tr. 3:22-23; Govt. Ex. 19.)  There were no doors or other means to close off the space. (Tr. 3:23.)  Linda Burke purchased the computer. (Tr. 3:25.)  It did not require a password to log on, and both Linda Burke and her daughter had full access to

_____

    [7]    A review of the docket in that matter reveals that the case was originally filed in Clark County, Nevada, but was removed by defendants to federal court.

    [8]    Linda Burke testified that at some point during the litigation, James Burke sought to be removed or was removed as a plaintiff. (Tr. 3:62.)  However, the filings state that they are made on behalf of defendant, (Ex. 2-4 to Supp. Standing), and the court's review of the docket in that matter does not reveal that James Burke was removed as a party.

everything on the computer.  (Tr. 3:25-26.)  Furthermore,
defendant had his own lap top that he brought when he came to
visit.  (Tr. 3:26.)  Beyond defendant's unequivocal denial of
ownership in the house and the property within the house,
defendant failed to evince any conduct that demonstrates an
expectation of privacy in the computer; rather, the evidence
demonstrates that anyone who had access to the computer also had
full access to all its contents.

In light of the foregoing evidence, the court finds that
defendant James Burke did not have a subjective expectation of
privacy in the residence or in the property seized at the
residence.  Prior to the search, at the time of the search, and
months after the search, defendant expressly denied living at the
residence and having any ownership interest in the residence or
in the boxes stored in the garage and the house.  His explicit
statements and conduct relinquished any expectation of privacy in
the place searched and the property seized.  His contradictory
and self-serving testimony made years after the search during the
course of the criminal prosecution is not credible.  As such, the
court could deny defendant's motion to suppress on this basis
alone.  See Decoud, 456 F.3d at 1007; United States v. Sangineto-
Miranda, 859 F.2d 1501, 1510 (6th Cir. 1990) (denying defendant's
motion to suppress because his conduct demonstrates that he did
not have a subjective expectation of privacy in the place
searched).

### b.   Reasonable Expectation of Privacy

However, assuming arguendo and for the sake of completeness
that defendant could demonstrate a subjective expectation of

privacy in the residence searched and the specific evidence at issue – namely, the computer and boxes of documents – such an expectation was not reasonable under the facts in this case.

In determining whether a defendant's expectation of privacy is reasonable and one that society is prepared to recognize as legitimate, the court must take into account all the circumstances.  See United States v. Fultz, 146 F.3d 1102, 1105 (9th Cir. 1998).  Relevant factors in this inquiry include (1) an ownership interest in the property; (2) legitimate presence at the time of the search; (3) the right to exclude others from the property; (4) the precautions taken to maintain privacy; and (5) the exercise of control and/or supervision over the place searched or items seized.  See United States v. Perez, 689 F.2d 1336 (9th Cir. 1982); see also Fultz, 146 F.3d at 1105 ("A person has an expectation of privacy in his or her private, closed containers."); United States v. Quinn, 751 F.2d 980, 981 (9th Cir. 1984) ("Dual ownership remains significant under the expectation of privacy standard.")  However, "no one circumstance is talismanic."  Haydel, 649 F.2d at 1154.  "Moreover, a person's expectation of privacy may depend on the nature of the intrusion."  Shryock, 342 F.3d at 978 (citing Minnesota v. Carter, 525 U.S. 83 (1998)).

### I.  Ownership

"[P]roperty ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated."  Salvucci, 448 U.S. at 91 (noting that ownership is merely a factor in the court's inquiry); see Quinn, 751 F.2d at 981.

13

1    Defendant's statements and the conduct of the relevant

2 parties weighs against a finding that defendant had an ownership

3 interest in the Las Vegas residence.  As set forth above,

4 defendant has expressly disavowed any ownership interest in the

5 residence and the property seized prior to, during, and

6 subsequent to the challenged search.  Moreover, independent

7 evidence corroborates the truth of these statements.  Linda Burke

8 testified that when she moved to Las Vegas with the kids, she did

9 not want defendant to move with her until he cleared up the legal

10 problems.  (Tr. 3:10.)  The lease agreement for the residence was

11 signed only by Linda Burke.  (Tr. 3:11; Govt. Ex. 1.)  This

12 stands in contrast to lease agreements for previous residences in

13 which James and Linda Burke lived where both signed the rental

14 agreements.  (Tr. 3:13; Govt. Exs. 4-5.)  The down payment for

15 the Las Vegas residence was paid from a bank account for which

16 Linda Burke was the only signatory.  (Tr. 3:14; Govt. Ex. 3.)

17 Linda Burke was responsible for the rental payments on the

18 residence and also made payments from an account for which she

19 was the only signatory.  (Tr. 3:13-15.)  The water bills, cable

20 bills, gas bills, and power bills[9] were in Linda Burke's name and

21 were paid from her account.  (Tr. 3:15-18.)

22    Defendant argues that because he and Linda Burke were not

23 legally separated at the time of the search, he has an ownership

24 interest in all of her property based upon principals of

25 community property.  While neither the parties nor the court were

26

27         [9]    The power bills listed James Burke as a co-applicant.
(Govt. Ex. 9.)  Linda Burke testified that she didn't know why
his name was on the bill, but she was responsible for payment.
28 (Tr. 3:18.)

able to find any case law examining the role of marriage or community property principals in a Fourth Amendment context, the prenuptial agreement signed by the parties undermines defendant's argument.[10]   Specifically, the prenuptial agreement provides that "Each of the parties shall separately retain all rights and interests . . . in all property of any kind which he or she now owns or hereafter acquires . . . and said property shall be known herein as 'Separate Property.'"  (Govt. Ex. 10; Tr. 3:19.)   The agreement also provides that James Burke shall pay expected living expenses to Linda Burke to administer and that Linda Burke is entitled to one half of all James Burke's net after tax income as separate property.  (Govt. Ex. 10.)   Finally, the prenuptial agreement states that the parties shall maintain separate a savings, checking, or brokerage account and place their separate property into such account.  (Id.)   In the event of legal separation or divorce, each party's separate property was to belong solely to the respective party.  (Id.)

Linda Burke testified that defendant made clear to her that the purpose of the document was to clarify that she had her own separate property and to protect her and any children she may have.  (Tr. 3:19.)   Further, at a prior judicial proceeding, defendant testified that he and Linda Burke wanted separate property in their marriage, and that as a result of the prenuptial agreement, they had separate property.  (Tr. 1:34, 36-

---

[10]     The court notes that this order does not make any findings with respect to the proper distribution of assets among James and Linda Burke.   Rather, it discusses the existence and nature of the prenuptial agreement only to the extent it affects defendant's burden of demonstrating a legitimate expectation of privacy.

37.)  Defendant also gave deposition testimony regarding the intent to keep the marital property separate, "meaning no community property."  (Tr. 1:38-40.)  Finally, in a declaration filed by defendant in connection with the bankruptcy proceedings, defendant stated:

> I have continually told my wife Linda that the funds and property that are currently being fought over, the assets of hers and the children and not the property of mine or the Truck-A-Way estate.

(Tr. 1:49.)

The credible evidence at the hearing supports that both James Burke and Linda Burke signed a prenuptial agreement that sought to keep property separate and that they adhered to this arrangement.  Specifically, Linda Burke maintained her own accounts and paid for all expenses out of this separate account, which per the agreement, was her separate property.  Moreover, the statements made by James Burke prior to, during, and subsequent to the search indicate that he viewed the property paid for from Linda Burke's account as her property, even though the money was given to her by him.  (See also Tr. 1:55-56) (testifying that the money given to Linda was placed in her account, to which he was not a signatory, and that he did not regulate how she spent that money).  As such, under the factual circumstances supported by the credible evidence in this case, defendant did not have an ownership interest in the places searched or the property seized by virtue of his marriage to Linda Burke.  Rather, all reliable evidence indicates that shared ownership was exactly what defendant sought to avoid.  Therefore, this factor weighs against a finding that defendant had a

1  legitimate expectation of privacy in the residence or any
2  property within that residence.

3                    **ii.   Legitimate Presence**

4        Legitimate presence at the time of the search is a relevant
5  factor in analyzing whether a defendant has an expectation of
6  privacy.  <u>Rakas</u>, 439 U.S. at 148; <u>Perez</u>, 689 F.2d at 1338.
7  However, a defendant's legitimate presence on the premises is
8  insufficient, by itself, to properly raise a challenge under the
9  Fourth Amendment.  <u>United States v. Armenta</u>, 69 F.3d 304, 309
10 (9th Cir. 1995) (citing <u>Olson</u>, 495 U.S. at 97.)  Where the
11 defendant is "more than a casual visitor or a mere transient," he
12 may have a legitimate expectation of privacy in another's
13 residence.  <u>Sangineto-Miranda</u>, 859 F.2d at 1510; <u>see also</u> <u>United</u>
14 <u>States v. Gamez-Orduno</u>, 235 F.3d 453, 458 (9th Cir. 2000) ("An
15 overnight guest in another's home has a reasonable expectation of
16 privacy.").

17       The evidence submitted by the parties demonstrates that
18 while defendant was not physically present at the time of the
19 search, he was, at various times, legitimately on the premises.
20 Linda Burke consistently acknowledged that, as her husband and
21 the father of her children, and in order to deal with some of the
22 legal issues surrounding his personal and the Truck-A-Way
23 bankruptcies, defendant went to and from the residence.  (Tr.
24 3:12, 72-73, 91-93.)  Generally, he would visit for a couple days
25 on an infrequent basis, approximately three or four days in
26 January 2003 and between three and five days in February 2003.
27 (Tr. 3:35, 94.)  Defendant had a key to the residence, and many
28 of his personal items were moved from Vacaville to Las Vegas.

                                   17

(Tr. 3:56.)  He had a closet at the residence approximately half full with clothes and two drawers in a dresser.  (Tr. 3:32, 50.) However, Linda Burke testified that defendant's items were in the Las Vegas residence because she packed everything in the move and "things were slowly dispersed" once she arrived.  She testified that she "could never get him to come and get everything."  (Tr. 3:33.)

However, the evidence does not support defendant's assertion that he lived at the Las Vegas residence.  Again, as set forth above, defendant has expressly represented that he did not live at the Las Vegas residence with Linda Burke and the children. Linda Burke also testified that defendant did not live there. (Tr. 3:10, 12.)  This testimony was corroborated by Linda Burke's neighbor, Jackie Frye ("Frye"), who testified that in the months leading up to the search she seldom saw James Burke at the residence, maybe a couple times a month.  (Tr. 2:77.)  Based upon these observations, Frye concluded that defendant did not live at the residence.  (Tr. 2:75-76.)

Rather, the reliable evidence supports the conclusion that defendant was a sporadic and infrequent visitor in the months immediately preceding the search.  While defendant had a key, he generally called Linda Burke to alert her that he was coming. (Tr. 3:12.)  The credible testimony indicates that when he visited, he slept on the couch.  (Id.)  He would bring a suitcase with clothes and a briefcase.  (Id.)

In support of his assertion that he lived at the Las Vegas residence, defendant testified that he had procured a Nevada driver license and was receiving mail at the residence.  (Tr.

18

1:11, 14-15.)   However, defendant procured a California driver

license as well in the weeks prior to receiving his Nevada

license and renewed that California license in 2006.  (See Govt.

Ex. 18.)   In neither instance did defendant provide a mailing

address of the Las Vegas residence.  (Id.)   Further, Linda Burke

testified that defendant "seldom" received personal mail at the

residence.  (Tr. 3:29, 61.)   The only consistent mail addressed

to defendant at the Las Vegas residence was correspondence from

attorneys relating to the bankruptcy proceedings.  (Id.; see also

Tr. 1:12-19 (defendant identifying only mail received by various

lawyers and law firms connected to the pending bankruptcy

proceedings)).

Moreover, defendant had multiple locations where he claimed

residency, including the Las Vegas residence at issue, (Tr. 1:5),

two hotels in Sacramento, (Tr. 1:6), and his brother's residence

in Sacramento, which he used for purposes of securing a driver's

licence from the Department of Motor Vehicles, (Tr. 1:28).

Furthermore, there was testimony that he kept personal belongings

and boxes at his daughter's residence in Phoenix, Arizona, and

that he may have stayed there.  (Tr. 3:31, 77.)   There was also

testimony that he stayed at Linda Burke's Palm Desert, California

condominium in 2003 and kept clothes, toiletries, and records

there.  (Tr. 3:99.)   Defendant had a P.O. Box in Las Vegas, in

Palm Desert, and in Arizona.  (Tr. 3:29.)   It is undisputed that

defendant was not on the premises at the time of the search.   It

is also undisputed that defendant was legitimately on the

premises as an overnight visitor at times preceding the search.

/////

1    Based upon the totality of the evidence, the court does not
2  find that defendant lived at the Las Vegas residence or had a
3  continued expectation of privacy in the residence in his absence.
4  Defendant visited only a handful of times in the months preceding
5  the search, alerting Linda Burke that he would be visiting.  He
6  often brought clothes and personal effects with him, and Linda
7  Burke asked him to remove his personal effects and possessions
8  that she brought to the residence.  These facts, coupled with the
9  fact that he stored clothes, toiletries, and records at other
10  residences, indicates that he did not treat the Las Vegas
11  residence as his home nor could he reasonably do so.  While among
12  all factors, defendant comes closest to the factor of legitimate
13  presence; nevertheless, looking at the totality of the
14  circumstances, it is far short of establishing a legitimate
15  expectation of privacy in the residence generally.[11]  Cf. United
16  States v. Fields, 113 F.3d 313, 320 (2d Cir. 1997) (holding that
17  the defendant had a reasonable expectation of privacy on the
18  premises where he paid $125 per week for the privilege of using
19  the apartment, made use of it on 40 or 50 occasions, could bring
20  guests, and could come and go as he pleased even if the owner was
21  not present).

22              **iii. Control and Supervision**

23    The remaining factors that the Supreme Court and the Ninth
24  Circuit have found relevant – namely the right to exclude others

25  _____

26    [11]   The court also notes that defendant's showing on this
   factor with respect to the residence did not significantly
27  further his showing with respect to the particular evidence
   addressed by this motion, namely the boxes and computer seized
28  from the residence.

from the property, the precautions taken to maintain privacy, and the exercise of control and/or supervision over the place searched or items seized - focus on the affirmative measures taken by a defendant to ensure his privacy interests.  Where a defendant has taken reasonable steps that manifest an expectation that his or her property remain free from public examination, an expectation of privacy may be reasonable.  <u>See</u> <u>Davis</u>, 932 F.2d at 757 (holding that the defendant had a legitimate expectation of privacy in another's apartment where he had a key, could come and go as he pleased, and took the precaution of storing things in a locked safe to assure privacy).

In this case, defendant has failed to demonstrate that he took sufficient steps to exercise control and maintain privacy in the boxes of documents or the computer seized.  As an initial matter, defendant unequivocally disclaimed ownership of all the boxes at issue in this case, stating that they were the property of Linda Burke and his children.  Second, Linda Burke paid the rental payments and other household costs from her separate property.  <u>Cf.</u> <u>Davis</u>, 932 F.2d at 757 (finding that the defendant exercised partial or joint control over the premises by assuming an ongoing obligation to pay the rent).  Third, defendant left the boxes in a residence to which he did not have unrestricted access or control.  The computer was similarly left in a room with no doors or locks and was not password protected.  Fourth, there is no evidence that he had the right to exclude anyone from the premises.  Fifth, he was only at the residence a handful of times prior to the search.  As such, he was not actively supervising, monitoring, or ensuring the safety or privacy of the

boxes or the computer.  Indeed, defendant admitted that he was
uncertain if there were in fact boxes in the house at the time of
the search, (Tr. 1:69); this uncertainty is hardly consistent
with the type of control and precautionary measures that evince
an expectation of privacy.  Therefore, this factor weighs against
an expectation of privacy in the specific places searched and
items seized.

### iv.  Nature of the Intrusion

Finally, the court notes that the nature of the intrusion,
specifically the pending bankruptcy proceedings which
precipitated the search at issue, renders defendant's position
troubling.  A debtor who has filed for bankruptcy "is not
automatically stripped of any and all reasonable expectations of
privacy with respect to property of the estate."  In re. Kerlo,
311 B.R. 256, 266 (C.D. Cal. 2004); In re. Barman, 252 B.R. 403,
414 (E.D. Mich. 2000).  However,

> [D]ebtors who have filed for bankruptcy relief must
> have a significantly reduced expectation of privacy in
> their "houses, papers, and effects" that society is
> prepared to recognize as reasonable.  The reduced
> expectation of privacy is a natural consequence of the
> substantial and detailed disclosures that are inherent
> in the bankruptcy process.

Barman, 252 B.R. at 414.

To the extent that defendant had an interest in the
documents stored in the boxes or in the computer, it would appear
that he should have disclosed their contents in the bankruptcy
proceedings.  The records at issue included "business records, .
. . legal pleadings, . . . tax returns, . . . license plates
[related to the defendant's trucking business], . . . airplane
logbooks [related to a personal asset], . . . corporate

22

1  seal, . . . unused letterhead, . . . [and] checks." (Tr. 2:117.)

2  Whether located in bankers boxes or stored on computers,

3  the bankruptcy court's order required defendant to disclose such

4  information. (Tr. 3:110.)  It is therefore troubling that

5  defendant seeks to assert a legitimate expectation of privacy in

6  documents that he was required by law to expose to the public.

7              **v.   Totality of the Circumstances**

8       Viewing all the circumstances as a whole, the court holds

9  that even if defendant could demonstrate a subjective expectation

10 of privacy in the residence or the specific property seized, this

11 expectation of privacy is not one that society is prepared to

12 recognize as legitimate.  Most importantly, defendant's express

13 statements unequivocally disavowed an interest in the residence

14 and the property seized from the residence.  These statements

15 were not simply made once, but rather repeated orally and in

16 writing and were *consistent* with defendant's positions prior to,

17 during, and subsequent to the search.  Defendant memorialized his

18 position that the residence and the property therein was the sole

19 property of Linda Burke and the children subsequent to the search

20 and allowed statements recounting this position to be filed on

21 his behalf in a federal district court.  He also testified under

22 oath on numerous occasions that he and his wife intended and

23 acted to keep their property separate throughout the marriage.

24 It is hardly surprising that defendant seeks to recant such

25 statements only now, years after the search and when the contrary

26 position would better serve his interests in the face of a

27 criminal prosecution.

28 /////

1    Moreover, defendant's conduct supports his prior statements

2  that he did not have an expectation of privacy in the house or

3  the property therein.   He stayed at the Las Vegas residence

4  sporadically and would contact his wife before coming.   Even

5  though some of defendant's personal items were moved from

6  California to Las Vegas, defendant would often bring a suitcase

7  of clothes in his car and his own lap top.   While he received

8  some legal mail at the Las Vegas residence, he had numerous P.O.

9  Boxes and used various addresses for different purposes.

10  Furthermore, despite the fact that he was an infrequent visitor

11  and that the computer and boxes at issue were kept in relatively

12  open spaces, defendant did nothing to safeguard the particular

13  items seized from examination.

14    Finally, the court again notes that the search at issue took

15  place after defendant had filed for bankruptcy protection on

16  behalf of himself and Truck-A-Way.   The particular items seized,

17  the boxes filled with documents and the computer, likely

18  contained documents that defendant was required by law to expose

19  to the public.   While the court acknowledges that filing for

20  bankruptcy does not strip an individual of all Fourth Amendment

21  protection, under the facts of this case, the court notes that

22  this is but another factor that weighs against a finding that

23  society would deem defendant's expectation of privacy in the

24  places searched and the items seized as legitimate.

25    The defendant relies primarily on two cases in arguing that

26  he has a legitimate expectation of privacy.   See Davis, 332 F.3d

27  1163, 1167 (9th Cir. 2003); see also Fultz, 146 F.3d 1102.

28  /////

24

However, both <u>Davis</u> and <u>Fultz</u> are factually and legally distinguishable from this case.

In <u>Davis</u>, law enforcement conducted a warrantless search of an apartment for which defendant was not on the lease and found a closed gym bag under the bed where the defendant slept.  323 F.3d at 1163.  The Ninth Circuit clarified that the question before the court was not whether the defendant had a legitimate expectation of privacy in the contents of the searched apartment generally, but whether he could reasonably believe that the contents of his gym bag located within the apartment would remain private.  <u>Id</u>.  The court found that although the defendant did not have exclusive control over the bed, he was more than an occasional guest.  <u>Id</u>. at 1167.  Under the totality of the circumstances, the Ninth Circuit held that the defendant had a legitimate expectation of privacy in the closed gym bag because he had a reasonable belief that the closed bag would remain private under the bed in an apartment where he sleeps and keeps his belongings.  <u>Id</u>. at 1167-68.  Conversely, in this case, the defendant was nothing more than a sporadic and infrequent visitor in Linda Burke's house.  More importantly, unlike in <u>Davis</u>, the defendant *expressly disclaimed any interest*, subjective or otherwise, in the Las Vegas residence and the items stored therein.  Finally, unlike the closed gym bag under the bed in <u>Davis</u>, much of defendant's property in this case was in an open office alcove or shared garage available and obvious to anyone with access to those locations.  On these facts, it is not apparent that the defendant had a reasonable expectation of privacy, particularly in light of the pending bankruptcy

25

1  proceedings in which the evidence at issue should likely have

2  been disclosed to the public.

3       The Ninth Circuit's decision in <u>Fultz</u> is similarly

4  distinguishable. 146 F.3d at 1105.  In <u>Fultz</u>, the police searched

5  the appellant's cardboard boxes, which were stored in the garage

6  of a house where he was staying intermittently.  <u>Id.</u> at 1106. The

7  homeowner told the police that the boxes were stored in a

8  segregated area of the garage and did not belong to her.  <u>Id.</u> at

9  1104-06.  The court concluded that the relevant question was not

10 whether the owner of the house "had access to the garage, but

11 whether she had mutual use and joint access to or control over

12 the boxes." <u>Id.</u> at 1106.  Unlike <u>Fultz</u>, defendant Burke did not

13 have a reasonable subjective expectation that the items and boxes

14 of records stored at the residence would remain private.

15 Defendant did not own the boxes because, according to both the

16 testimony of Linda Burke as well as defendant's own notes, they

17 were the property of Linda Burke.  Moreover, many of the

18 documents and other items taken during the search of the

19 residence, such as the computer, were not segregated and under

20 the claimed ownership and control of defendant, but were left in

21 unrestricted locations available to anyone with access.  And,

22 again, the search at issue must be considered in the context of

23 the ongoing bankruptcy proceedings.

24      Therefore, after weighing all the credible evidence, the

25 court holds that defendant James Burke had neither a subjective

26 nor reasonable expectation of privacy in the Las Vegas residence

27 generally or in the specific boxes and computer seized from the

28 residence that are at issue in this motion.  Accordingly,

defendant's motion to suppress evidence seized from the Las Vegas
residence is DENIED.

   **2.   Search of the Storage Facility**

       **a.   Subjective Expectation of Privacy**

   Similarly, the court also finds that defendant has not borne
his burden of demonstrating that he had an actual, subjective
expectation of privacy in the Las Vegas storage facility or the
specific boxes sought to be suppressed by this motion.

   Defendant expressly denied any interest in the boxes stored
in the storage facility.   Prior to the search, Linda Burke
testified that she specifically questioned James Burke regarding
the boxes at issue:

> Q:   Can you explain the Court your understanding of
>      whose boxes these were?
>           . . .
> A:   Primarily I was to go through the garage where
>      most of the boxes were.  Some of them had
>      different names on them Vista, Blue Ridge,
>      different companies marked on the boxes.  When I
>      moved from Buck to Las Vegas, those boxes came
>      with me and Jim actually helped move all of that
>      with his son-in-law, Johnny.
>           He made it clear that those were my boxes
>      because I had interest in these companies.  I
>      asked him very specifically, "Are these any of the
>      boxes that were asked for you to hand over for the
>      bankruptcies?"
>           And he said, "No.  These are yours and the
>      kids.  These are for your interest solely."

(Tr. 3:23-24; see also Tr. 3:58-59.)  Under the separate property
clauses set forth in the prenuptial agreement, the understanding
that these boxes were solely her property made sense to Linda
Burke.  (Tr. 3:24.)  Linda Burke further testified that defendant
told her to keep these boxes in the garage, but that when she
protested that there wasn't enough room, she opened up a storage
facility.  (Tr. 3:25, 58.)  The storage facility was rented

27

1  solely in her name, and she was responsible for the rental

2  payments.  (Govt. Ex. 2; Tr. 1:62.)

3      Under these facts, the court finds that the defendant did

4  not have a subjective expectation of privacy in the boxes seized

5  from the storage facility.  While he had access to and knowledge

6  of what was in the boxes, defendant expressly stated that the

7  contents of those boxes were Linda Burke's property, not his, and

8  as such, purportedly not subject to the ongoing bankruptcy

9  proceedings.

10                 **b.   Reasonable Expectation of Privacy**

11      However, assuming defendant could demonstrate a subjective

12  expectation of privacy in the items seized, that expectation was

13  not reasonable.

14      The Ninth Circuit has recognized that a defendant's

15  "expectation of privacy in a commercial storage area is lower

16  than that in a residential area."  United States v. Sarkisian,

17  197 F.3d 966, 986-87 (9th Cir. 1999) (citing Carter, 525 U.S. 83

18  ("[p]roperty used for commercial purposes is treated differently

19  for Fourth Amendment purposes than residential property."); New

20  York v. Burger, 482 U.S. 691, 700 (1987) (the "expectation of

21  privacy in commercial premises . . . is different from, and

22  indeed less than, a similar expectation in an individual's

23  home"); see United States v. Silva, 247 F.3d 1051, 1056 (9th Cir.

24  2001) (holding that the defendants' possession of a key, though

25  indicating permission to enter the shed, was insufficient to

26  establish a legitimate expectation of privacy in the shed).

27  However, as with a residence, the court looks to the totality of

28  /////

28

the circumstances in determining whether a defendant has a
legitimate expectation of privacy in a storage area.   <u>Id.</u>

The circumstances developed by the reliable evidence in this
case demonstrate that defendant did not have an ownership
interest in the storage facility or the boxes seized and did not
have unrestricted access to the facility.   Again, as set forth
above, defendant expressly denied ownership of the boxes stored
in the storage facility, and such denial of any ownership
interest is consistent with the text and intent of the prenuptial
agreement as evidenced by both the terms of the agreement and
defendant's prior testimony regarding the agreement.   Further,
defendant did not purchase the lease nor did he make the rental
payments for the storage facility.   (Tr. 3:26, 29.)   Furthermore,
defendant's access to the facility was also not unrestricted.
The keys to the storage facility were kept in Linda Burke's Las
Vegas residence.   (Tr. 3:30.)   As set forth above, defendant
stayed at the residence intermittently, but generally called
before coming.

It is undisputed that defendant had access to both the
storage facility and the boxes at issue in this motion; however,
this is insufficient to confer a legitimate expectation of
privacy.   <u>See</u> <u>Silvas</u>, 247 F.3d at 1056 (no legitimate expectation
of privacy where the defendants were on the premises "solely for
commercial purposes at the behest of the unidentified sub-lessor
of the shed").   Defendant was listed as a person authorized for
access, along with Linda Burke's sister and brother-in-law.
(Govt. Ex. 2.)   Linda Burke testified that while defendant made
clear that the documents were hers, defendant managed any

1  business transactions related to these interests.  (Tr. 3:59-60.)
2  As such, he had lawful access to the storage facility and the
3  boxes at issue.  However, without more, legitimate presence on
4  the premises does not equate to a legitimate expectation of
5  privacy.  Armenta, 69 F.3d at 309.

6      Moreover, there is no evidence that defendant exercised
7  supervision or control or otherwise took precautionary measures
8  to safeguard his privacy in the boxes.  Beyond expressly
9  disclaiming any interest in the boxes, there is no evidence that
10 he retained a key to the facility, had a right to exclude others
11 from the facility, or took any measures to identify the property
12 as his own.  Rather, the evidence indicates that in the time
13 period immediately preceding the search, defendant only visited
14 Las Vegas a handful of times and that at the time of the search,
15 he wasn't sure what boxes were at these locations.  This evidence
16 is inconsistent with a manifestation that the property would
17 remain private.  Cf. Perez, 689 F.2d at 1338 (holding that the
18 exercise of joint control and supervision evinced a reasonable
19 expectation of privacy in the vehicle searched).

20     Finally, as discussed supra, the nature of the search in the
21 context of the pending bankruptcy proceedings weighs against a
22 finding that defendant had a reasonable expectation of privacy in
23 the boxes at issue.  The credible evidence indicates that
24 defendant's use of the storage facility was primarily commercial
25 in nature.  These documents are purportedly business records that
26 in all likelihood should have been disclosed, and thus, are
27 subject to an even lesser expectation of privacy.
28 /////

30

1    Therefore, for the foregoing reasons, the court holds that

2  defendant had neither a subjective nor reasonable expectation of

3  privacy in the storage facility and more specifically, in the

4  boxes stored there.  Accordingly, defendant's motion to suppress

5  evidence seized from the storage facility is DENIED.

6  **B.   Motion to Dismiss**

7    Defendant moves to dismiss the indictment on the grounds

8  that the government lost or destroyed exculpatory evidence in

9  violation of his due process rights.  Defendant contends that a

10  three to four inch file of documents went missing during the

11  search and seizure on February 19, 2003.  Defendant asserts that

12  the documents included handwritten notes, thoughts on current

13  business or projects, Internet printouts on apartments he was

14  looking to invest in in 2001, tax information, and letters sent

15  and received.  (Tr. 6:139-40.)  The government asserts that

16  defendant's motion should be denied because (1) there is

17  insufficient evidence as to the existence and destruction of the

18  records; (2) there has been no showing of bad faith on behalf of

19  the government; and (3) there is insufficient evidence that the

20  documents would be admissible or that defendant has been

21  prejudiced.

22    Where evidence exculpatory to a defendant is lost or

23  destroyed, a defendant's due process rights may be implicated.

24  See Arizona v. Youngblood, 488 U.S. 51, 57-59 (1988); California

25  v. Trombetta, 467 U.S. 479, 486-89 (1984); United States v.

26  Cooper, 983 F.2d 928, 931 (9th Cir. 1993).  However, "[w]hatever

27  duty the Constitution imposes on the States to preserve evidence,

28  that duty must be limited to evidence that might be expected to

31

play a significant role in the suspect's defense." <u>Trombetta</u>, 467 U.S. at 488.   Therefore, in order to establish a denial of due process, the unavailable evidence (1) must have possessed exculpatory value that was apparent before the evidence was destroyed; and (2) must be of a nature that defendant would be unable to obtain comparable evidence by reasonably available means.   <u>Id.</u> at 489.   Moreover, the defendant must demonstrate that law enforcement acted in bad faith in failing to preserve the potentially useful evidence.   <u>Youngblood</u>, 488 U.S. at 58. "The presence of absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed."   <u>Cooper</u>, 983 F.2d at 931.

## 1.   Existence and Destruction of the Records

As an initial matter, there is insufficient evidence that the subject documents were ever in the possession of either the government or the individuals who conducted the search and seizure in February 2003.[12]   Defendant's certainty that the subject file was located in Las Vegas and seized during the search lacks credibility.   Defendant testified that although there were records at the Las Vegas residence, at least four boxes related to the bankruptcy were moved to Phoenix.   (Tr. 6:175-76.)   He also kept bankruptcy files with him.   (Tr. 6:176.) Further, defendant testified that he can't remember what was in every box or every folder that he kept in Las Vegas.   (Tr. 6:176.)   This is consistent with defendant's testimony that he

---

[12]   While not a specifically enumerated aspect of the due process inquiry set forth by the Supreme Court, a foundational element must be that the government actually possessed the subject evidence.

1  could not remember that he left any boxes in the residence at the
2  time of the search.  (Tr. 6:69.)

3       This is also consistent with defendant's cavalier handling
4  of other business documents.  Defendant Burke testified that he
5  typed at least one of the letters in the subject file at the desk
6  top computer in TAW's office in early 2001.  (Tr. 6:143.)  When
7  asked about the location of TAW's computer, he testified that the
8  "computer was gone when we shut the company down.  I think it was
9  actually my brother's computer that we borrowed at the time."
10 (Id.)  However, neither defendant nor his brother know where that
11 computer is.  (Tr. 6:143-44.)   Burke further testified that had
12 a personal lap top computer up until at least 2003.  (Tr. 6:165.)
13 According to defendant's testimony, although he does not recall
14 using the lap top computer to make any of the documents in the
15 file, he has since disposed of this lap top computer.  In light
16 of defendants' inability to state with any particularity where
17 files were stored, where boxes were located, or where computers
18 used during the course of his business are, it strains credulity
19 that defendant can state with certainty that this particular file
20 was stored in the Las Vegas residence and seized on February 19,
21 2003.

22      Moreover, defendant's contention that the government had
23 possession of the subject file is further undermined by the fact
24 that he did not report any of the documents missing to the
25 government, the bankruptcy court, or this court until July 2007,
26 nearly five years after the documents allegedly were taken.  (Tr.
27 6:160-61.)  Between 2003 and 2005, defendant was engaged in on-
28 going litigation with respect to the bankruptcy.  (Tr. 6:166-67.)

Defendant's attorney examined the boxes twice in May or June 2003, (Tr. 6:119-20), Linda Burke's attorneys examined the boxes in June 2005, (Tr. 6:122), defendant and his CPA examined the boxes in July 2005, (Tr. 6:124), Linda Burke's attorneys examined the boxes in March 2006, (Tr. 6:127), and defendant and his attorney examined the boxes in April 2006, (Tr. 6:129).  At no point during the litigation surrounding the bankruptcies or after the numerous inspections made by the defendant, his codefendant wife, and his representatives did anyone raise the issue of a missing file.

Therefore, in light of the credible evidence before it, the court finds that there is insufficient evidence that either the government or the individuals who executed the search on February 19, 2003 ever had possession of the alleged exculpatory evidence at issue in defendant's motion.

## 2.   Bad Faith Attributable to the Government

Assuming arguendo that the government or anyone associated with the search and seizure had possession of the subject file,[13] defendant has failed to demonstrate that the government acted with bad faith in failing to preserve the evidence.

Defendant argues that bad faith is established by the presence of Lyon at the search.  At the time of the search, Lyon represented a creditor in defendant's bankruptcies.  (Tr. 5:34.) However, she also served as special counsel for the trustee,

---

[13]   Because the court holds that defendant has not established the requisite elements of a due process claim, it does not reach the issue of whether the conduct of the individuals who executed the search and seizure is attributable to the government.

Aceituno, in defendant's personal bankruptcy. (Tr. 4:180.)

Defendant contends that the potential conflict of interest raised

by Lyon's representation is sufficient to demonstrate bad

faith.[14]

The court disagrees. While it is unusual, a principal

creditor's attorney can also represent the trustee in a

bankruptcy proceeding when there is a special need by the

trustee. (Tr. 5:35-36.) Because of her prior connection to the

case and relationship with one of Burke's creditors, Lyon's

representation of Aceituno was specifically disclosed to the

bankruptcy court. (Tr. 4:215.) As such, defendant's innuendo

that Lyon's very representation of Aceituno was somehow suspect

from the outset is not well taken. There is no evidence that the

creditor paid for Lyon's services while she was conducting the

search. (Tr. 5:39.) There is no evidence that anyone recalls

Lyon taking or destroying evidence. There is no credible

evidence that Lyon would have been able to conceal or destroy a

three to four inch folder at the time of or subsequent to the

search. (See Tr. 6:147) (defendant testifying that the subject

file was a "big folder" that was not easily concealed). Further,

defendant has failed to demonstrate with any particularity that

Lyon had a motive to destroy the documents.

Rather, contrary to defendant's bald assertion in his

motion, the exculpatory nature of the subject evidence is far

from clear. The documents in the file consist primarily of

contemporaneous notes made by defendant, printouts relating to

---

[14]   The court notes that Lyon was not called as a witness
by the government or defendant at the evidentiary hearing.

potential investments, and correspondence with the bank.  It is
unclear how these documents relate to the guilt or innocence of
defendant.  Defendant argues that this evidence is central to the
defense because it would enable him to show what was in his mind
at the time he made specific business decisions.  (See also
6:158) ("It was what I was doing at the time.  I don't know how
it relates.").  However, this conclusory assertion not only fails
to identify with any particularity how the evidence regarding his
state of mind would exculpate him,[15] but it also fails to
substantiate how the exculpatory nature of the documents would be
apparent to Lyon, anyone else associated with the search, or the
government.  See Youngblood, 488 U.S. at 56, n.* (holding that
there was no due process violation where the defendant failed to
demonstrate the police knew the evidence would have exculpated
him); United States v. Rivera-Relle, 333 F.3d 914, 922 (9th Cir.
2003) (holding that no due process violation where it is not
clear there was any exculpatory value to the destroyed dispatch
tape); United States v. Vera, 231 F. Supp. 2d 997, 1002 (D. Or.
2001) (holding that there was no due process violation where
there was no obvious exculpatory value to the evidence apparent
to law enforcement or the government generally when it was
destroyed); cf. Cooper, 983 F.2d at 931-32 (holding that
defendant's due process rights were violated where the evidence's

---

[15]     Indeed, some of the documents appear inconsistent with
other statements made during the course of the bankruptcy
proceeding.  In particular, the defendant testified that these
records would show that he was "winding down" TAW.  (Tr. 6:168-
70.)  However, he testified under oath at the Section 341 meeting
of creditors that he was trying to keep TAW operational, which
would be consistent with a decision to file a Chapter 11
bankruptcy action.  (Id.)

potentially exculpatory value was repeatedly suggested to the government prior to destruction, and law enforcement assured the defendant and his counsel that it was being held as evidence while it was being destroyed).

Therefore, defendant has failed to demonstrate that the loss or destruction of evidence was done in bad faith.

### 3. Prejudice

Finally, assuming for the sake of completeness that defendant could demonstrate that the government had possession of the subject evidence and that it was lost or destroyed in bad faith, defendant has failed to demonstrate that he is prejudiced by the unavailability of the file.

First, it is unclear that the documents, if available, would have been admissible at trial. Defendant argues that the documents may have been admissible as an exception to the hearsay rule, pursuant to Federal Rule of Evidence 803(5), as a recorded recollection. For a document to be admissible under Rule 803(5), the party seeking to admit it must show (1) the record concerns a matter about which the witness once had knowledge but now has insufficient recollection to testify fully and accurately and (2) the witness made or adopted the record when the matter was fresh in the witness' memory and the record reflects that knowledge correctly. See Fed. R. Evid. 803(5). In this case, defendant has not shown that he has insufficient recollection to testify fully and accurately. To the contrary, he testified about the specific subjects he stated are covered by the documents in question. (Tr. 6:140-43.)

/////

37

1    Defendant also argues that the documents may have been

2  admissible as an exception to the hearsay rule, pursuant to

3  Federal Rule of Evidence 803(6), as business records.  Under Rule

4  803(6), a record is admissible if (1) the writing was made by a

5  person with knowledge at or near the time of the incident

6  recorded; and (2) the record was kept in the regular course of

7  that business.  <u>United States v. Miller</u>, 771 F.2d 1219, 1237 (9th

8  Cir. 1985). "The record will not be admissible, however, if the

9  source of information or the method or circumstances of

10  preparation indicate a lack trustworthiness." <u>Id.</u>  In this case,

11  defendant has not demonstrated that the notes and memos contained

12  in the file were made during the regular course of business.

13  Rather, he testified that notes were often made on a "white piece

14  of paper," a "sticky pad," or a "lunch bag." (Tr. 6:145.)  There

15  is no evidence that these notes were prepared or used during the

16  regular operation of TAW.  Moreover, defendant fails to cite any

17  support for his contention that notes jotted on sticky pads or

18  lunch bags bear the requisite characteristics of trustworthiness

19  for purposes of 803(6).

20    Second, defendant may be able to obtain comparable evidence

21  by other reasonably available means.  Defendant testified that a

22  majority of the notes reflected conversations and communications

23  with Steve Shelton at the Civic Bank of Commerce. (Tr. 6:145.)

24  However, Shelton hasn't testified in any of the proceedings, has

25  never been deposed, and has never been subpoenaed. (Tr. 6:144-

26  45.)  As such, Shelton's testimony may be an alternative source

27  of the information allegedly contained in the file.  Therefore,

28  /////

1  defendant has failed to demonstrate that he is actually

2  prejudiced by the loss or destruction of the file.

3      Accordingly, because the credible evidence does not

4  establish that (1) the government or any individual associated

5  with the February 19, 2003 search had possession of or destroyed

6  the file, (2) the exculpatory nature of the file was apparent and

7  destroyed in bad faith, or (3) defendant is prejudiced by the

8  unavailability of the file at trial, defendant's motion to

9  dismiss the indictment is DENIED.

10                              **CONCLUSION**

11      For the foregoing reasons, defendant's motion to suppress

12  and motion to dismiss are DENIED.

13      IT IS SO ORDERED.

14  DATED: January 23, 2009

15

16                              _____

17                              FRANK C. DAMRELL, JR.
                                UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28